THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PEGGY AUSTIN, Defendant-Appellant.

First District (3rd Division)   No. 1—85—2583

Opinion filed December 26, 1990.

Randolph N. Stone, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Jack M. O'Malley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Colleen A. Hyland, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Peggy Austin, was convicted of murder by a jury and sentenced to serve 30 years in prison. This court reversed her conviction and remanded the case for a new trial, holding that the trial court erred in refusing defendant's tendered jury instruction on voluntary manslaughter. (*People v. Austin* (1988), 170 Ill. App. 3d 1047, 524 N.E.2d 1063.) The Illinois Supreme Court reversed this court's decision and remanded the case for consideration of the other issues raised on appeal. (*People v. Austin* (1989), 133 Ill. 2d 118, 549 N.E.2d 331.) Upon remand, the defendant argues that (1) the trial court erred in refusing her tendered jury instruction on involuntary manslaughter; (2) the trial court erred in permitting the prosecution to elicit evidence regarding the type of bullet recovered from her gun; and (3) the trial court abused its discretion in sentencing her to a term of 30 years' imprisonment. We reverse and remand for a new trial.

The facts of this case have been set out fully in both the earlier appellate and supreme court opinions. Thus, for our purposes, we will only discuss the evidence relevant to our decision. On February 13, 1984, defendant boarded a Chicago Transit Authority (CTA) bus at the intersection of 74th Street and Ashland Avenue in the City of Chicago. Defendant deposited a 40 cent fare token into the fare box and displayed a student bus pass. The bus driver informed defendant that the pass was not valid because it was a school holiday. Defendant told the driver that she was only going a short distance and asked if she

could remain on the bus. The bus driver told defendant that because it would be unfair to passengers who paid full fare to allow defendant to remain on the bus, she would either have to pay full fare, leave the bus, or be removed. Defendant dropped an additional 40 cents into the fare box, but the bus driver told her that it was not enough. At this point, defendant had paid 80 cents of the $1 fare. Defendant did not have any more money, and she asked for a transfer, which would have allowed her to board connecting buses or trains without paying another fare. According to defendant, the bus driver responded, "No, just get the hell off the bus."

Defendant testified that when she attempted to reach for a transfer, the bus driver hit her hand with a metal transfer punch, and she responded by striking the driver in the face. Three State witnesses, however, testified that defendant struck the first blow when she slapped the bus driver in the face. Defendant testified that the bus driver retaliated by hitting her on the forehead with the transfer punch. Thereafter, defendant and the bus driver stood face to face and exchanged blows for approximately 30 to 40 seconds. At some point in the fight, defendant pulled a gun from her side pant pocket. Defendant testified that she pulled the gun to "scare" the bus driver.

Thereafter, the bus driver slapped or grabbed defendant's wrist, and, in the struggle, defendant fired a shot into the floor of the bus. Several of the bus passengers ducked down to the floor or rushed to exit through the rear bus door. The momentum of defendant and the bus driver's struggle allowed the driver to force defendant off the bus. After the parties were outside the bus, a second shot was fired, killing the bus driver. The entire fight lasted about two to three minutes. According to defendant, after they exited the bus, the bus driver tried to grab the gun, she jerked it away and it went off. Defendant testified that she did not pull the hammer back with her thumb and that she did not recall pulling the trigger. Two bus passengers testified that after defendant and the bus driver exited the bus, they were standing approximately 12 inches apart when defendant fired the second shot striking the bus driver in the chest.

Defendant first argues that the trial court erred in refusing her tendered jury instruction on involuntary manslaughter. We agree.

A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a); Illinois Pattern Jury Instructions, Criminal, No. 7.07 (2d ed. 1981).) A person acts recklessly when he consciously disregards a substantial

and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. (Ill. Rev. Stat. 1985, ch. 38, par. 4—6.) Murder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required. Murder requires the intent to kill or do great bodily harm or knowledge that the acts create a strong probability of such result, while involuntary manslaughter requires only reckless conduct which causes death. (*People v. Cowen* (1979), 68 Ill. App. 3d 437, 441, 386 N.E.2d 435, 438-39.) If there is some evidence in the record which would reduce the crime to involuntary manslaughter, the defendant is entitled to an instruction defining the lesser offense. *People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984, 994.

■ It is defendant's theory that she and the bus driver struggled over a gun defendant pulled out during a fight. The gun went off during the scuffle. Defendant testified that the bus driver tried to grab the gun, she jerked it away, and it went off. Defendant did not recall either pulling back the hammer or pulling the trigger of the gun. Under the circumstances, we believe there was some evidence, if believed, that defendant unintentionally caused the death of the decedent by acts which were performed recklessly and likely to cause death or great bodily harm. We therefore conclude that defendant was entitled to an instruction defining the offense of involuntary manslaughter. At the new trial, if the evidence on the issue is at least the same, defendant should be entitled to have the jury instructed on the offense of involuntary manslaughter.

Defendant also argues that the trial court erred in permitting the prosecution to elicit evidence regarding the type of bullet recovered from her gun. Because this issue may arise again upon retrial, we address it now.

The pertinent portions of testimony follow:

"PROSECUTOR: *** Well, would you describe one of the live rounds that was People's Exhibit 8. Could you describe that round of ammunition to the jury?

WITNESS: This a .38 special caliber live round of ammunition loaded with a hollow point bullet and loaded to higher pressures which is what the plus P stands for and a standard .38 special round of ammunition.

PROSECUTOR: Is plus P loaded ammunition a target practice bullet?

WITNESS: No, sir.

PROSECUTOR: Are the three exhibits, the live bullets that you have in front of you, are they authorized ammunition for Chicago Police Officers?

WITNESS: No, sir.

PROSECUTOR: Are there any sanctions upon police officers if they use that type of ammunition?

DEFENSE ATTORNEY: Objection.

\* \* \*

THE COURT: All right. Your objection is overruled. He can clear it up.

\* \* \*

PROSECUTOR: Do you know of your own knowledge whether or not police officers, Chicago Police Department Officers are authorized to use that type of ammunition?

WITNESS: I am familiar with all the general orders and rules and regulations concerning what is authorized ammunition for the Chicago Police Department Officers.

PROSECUTOR: Is that authorized ammunition?

WITNESS: No, sir.

PROSECUTOR: Are there sanctions against the Chicago Police Officer should they use that type of ammunition?

DEFENSE ATTORNEY: I object to that question, Judge.

THE COURT: All right. He may answer. Your objection is overruled.

WITNESS: I know violation of general orders carries sanctions. I am now [sic] aware of what sanctions."

▪ The test of admissibility of evidence is whether it fairly tends to prove the particular offense charged, and whether what is offered as evidence will be admitted or excluded depends upon whether it tends to make the question of guilt more or less probable, *i.e.,* whether it is relevant. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702.) Further, the admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Ward,* 101 Ill. 2d at 455-56.

▪ Defendant argues that evidence regarding the type of bullets used in her gun should not have been introduced at trial because it was irrelevant and allowed the State to improperly infer that defendant had an intent to kill based on the fact that her weapon was loaded with hollow point bullets. Defendant, however, testified at trial that she purchased the bullets only because she was told that they were "silver bullets." In light of the offense charged, the State was prop-

erly allowed to introduce evidence of the type of weapon and ammunition used by defendant during the commission of that offense. Any inference that defendant intended to kill or do great bodily harm to the victim was rebutted by the introduction of defendant's testimony regarding her reasons for carrying a weapon and purchasing that particular ammunition. Under these circumstances, we find no error in the trial court's admission of evidence on the subject of the type of ammunition used by defendant.

Defendant also argues that the trial court abused its discretion in sentencing her to a term of 30 years' imprisonment. In view of our conclusion that defendant is entitled to a new trial for the reasons we have stated, we need not decide the sentencing issue raised by defendant.

Accordingly, the judgment of conviction is reversed, and the case is remanded for a new trial.

Reversed and remanded.

CERDA, P.J., and WHITE, J., concur.